UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TIMOTHY S. FORSMAN, ) | |
| ) | |
| Plaintiff, ) | Case No.: 3:07-0327 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| RANDY K. ROUSE, ) | |
| and BROADWAY NATIONAL BANK, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendants (Docket No. 26), to which the plaintiff has responded (Docket No. 35), and the defendants have replied (Docket No. 38). For the reasons herein discussed, the defendants' motion will be denied.

## BACKGROUND

This case arises out of a business relationship between the plaintiff, Timothy S. Forsman, and the defendant, Randy K. Rouse. While employed at RBC Dain Rauscher ("RBC") as a securities broker, Forsman sold bonds to Broadway National Bank ("Broadway Bank"), where Rouse was an officer.[1]

The first incident between the parties occurred in November 2005, when Forsman inadvertently presented Rouse with inaccurate information about a bond's rating. Upon learning that Forsman's description had been inaccurate, Rouse declined the purchase. (Docket No. 36 at

---

[1] Unless otherwise noted, the facts are drawn from the Plaintiff's Response to Defendants' Statement of Undisputed Facts. (Docket No. 34.)

1

105-12.) As a result of this incident, their relationship soured, and Rouse blocked Forsman's incoming email messages.

In September 2006, Forsman called Rouse to make amends and offer to take him to dinner or a football game. Rouse explained that Forsman had offended him because he had been "forceful" and that he "hate[d] forceful brokers." However, Rouse accepted Forsman's apology and agreed to resume business with RBC. Rouse then indicated that, because Forsman was no longer on Broadway Bank's approved broker list, Forsman would have to re-apply for inclusion, which could be granted no earlier than December 2006. According to Forsman's deposition testimony, Forsman then said:

> I've never done anything on this call or any other call that is unprofessional and worthy of an apology. . . . [I]n fact, Randy, you know what, I retract my apology. I'm not sorry. I haven't done anything that is inappropriate. . . . [Y]ou know what, just have a nice life in your new house and I'll ju[s]t talk to you sometime again never.

(Docket No. 36 at 118-21.)

Following this conversation, Rouse called an old acquaintance, Paul Cassidy, who was employed in another division of RBC. According to Cassidy, Rouse excitedly told him that Forsman had "verbally abused" him during the September 2006 conversation. In his deposition, Cassidy said, "I will never recall [Rouse's] exact words, but . . . I remember that [Rouse] was personally afraid of [Forsman]. [Forsman] had mentioned the fact that enjoy your new house, or something to that effect . . . so [Rouse] was concerned for his safety." (Docket No. 32 at 8-9.) Additionally, Rouse told Cassidy that Forsman had used the "f-word" during the September 2006 conversation. (Docket No. 32 at 11-12.) Finally, Rouse questioned Cassidy as to why "a

2

firm of [RBC's] reputation would have an individual like [Forsman] working for [it]." (Docket No. 32 at 9, 15-16.)

Following his call with Rouse, Cassidy contacted James Ridenour, head of RBC's institutional sales division, to relay Rouse's descriptions of Forsman's conduct. Ridenour then called Rouse directly, and Rouse described his experiences with Forsman in both November 2005 and September 2006. In relating the November 2005 incident, Rouse indicated that he had instructed Forsman not to call him again. (Docket No.33 at 27, Ex. 2.) Additionally, in relating the September 2006 conversation, Rouse indicated that Forsman said that he hoped Rouse enjoyed "moving into his new fricking house" and then hung up on him. (Docket No. 33 at 13.) When Ridenour asked Rouse if he had sanitized Forsman's comments, Rouse indicated that he had, and that Forsman had, in fact, used the "f-word."[2] (Docket No. 33 at 13, 24-26, Ex. 2.)

Ridenour then contacted Greg Coffman, who was Forsman's supervisor. Based on Rouse's version of the November 2005 incident and the September 2006 conversation, Ridenour urged Coffman to terminate Forsman's employment, and Coffman agreed. (Docket No. 33 at 16-17.) The following day, when Coffman and Ridenour called Forsman to inform him of their decision, Forsman related his version of the November 2005 incident and the September 2006 conversation to them. Forsman contested Rouse's version of both events, particularly Rouse's

---

[2] The language Rouse used in answering Ridenour's question is unclear. According to Rouse's deposition, he responded by saying, "You know what [Forsman] meant." (Docket No. 37 at 46-47.) Ridenour, however, testified that Rouse answered, "Yes, I did [sanitize Forsman's comments]." (Docket No. 33 at 13.) In either case, Rouse's response led Ridenour to believe that Forsman had used the "f-word" during the September 2006 conversation.

3

assertion that he had used the "f-word" during the September 2006 conversation.[3] Following their call, Coffman drafted a memorandum that outlined the justifications for Forsman's termination.[4] (Docket No. 33 Ex. 2.)

## ANALYSIS

Forsman brought this action against Rouse and Broadway Bank. He alleges that Rouse's statements to Cassidy and Ridenour were defamatory and constitute intentional interference with employment and that Broadway Bank, as Rouse's employer, is vicariously liable for his actions. The defendants have moved for summary judgment with respect to Forsman's claims.

### I.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an

---

[3] Forsman disputes the extent to which he confirmed Rouse's version of the two events. Forsman stated that Rouse never instructed him not to call after the November 2005 incident and that Forsman did not hang up on Rouse to end the September 2006 conversation. (Docket No. 34 ¶ 16.) However, in his deposition, Ridenour testified that Forsman substantially confirmed Rouse's account, with the exception of whether Forsman had used the "f-word" in the September 2006 conversation. (Docket No. 33 at 17-18, Ex. 2.)

[4] The memorandum lists three reasons for Forsman's termination: calling Rouse after being asked not to, apologizing for prior behavior and later rescinding the apology, and telling Rouse to "enjoy your new home and your life - how about I call you back [. . .] never" and hanging up on him. (Docket No. 33 Ex. 2.) However, in another section, the memorandum also refers to Forsman's use of the "f-word." (*Id.*)

4

essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the

5

parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II. Defamation

The Tennessee Supreme Court has adopted language from the Restatement (Second) of Torts (1977) defining the elements of a defamation claim. *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978). The relevant portion of the Restatement provides:

> § 580B: Defamation of a Private Person. One who publishes a false and defamatory communication concerning a private person . . . is subject to liability, if, but only if, [he or she]
> (a) knows that the statement is false and that it defames the other,
> (b) acts in reckless disregard of these matters, or
> (c) acts negligently in failing to ascertain them.

Restatement (Second) of Torts § 580B (1977). Therefore, in order to establish a *prima facie* case of defamation under Tennessee law, Forsman must prove that Rouse knowingly, recklessly, or negligently published a false and defamatory statement about Forsman. *See Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

Forsman alleges that Rouse published false and defamatory statements about Forsman during Rouse's September 2006 telephone conversations with RBC officials Cassidy and Ridenour. (Docket No. 1 ¶¶ 4.3-4.4.) Forsman further alleges that Rouse knew that his statements about Forsman were false and defamatory at the time he made them and that Rouse's statements damaged Forsman's reputation, emotional health and business earnings. (Docket No. 1 ¶¶ 4.5-4.6.) Rouse argues, however, that summary judgment is appropriate because his statements about Forsman are not defamatory as a matter of law.

The ultimate question of whether a statement was understood by its intended audience to be defamatory is one for the jury. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn.

6

1978). However, the preliminary question of whether a statement is reasonably capable of being understood in a defamatory sense is a question of law for the court to resolve. *Id.* A statement is defamatory if it poses a "a serious threat to the plaintiff's reputation." *Stones River Motors, Inc. v. Mid-South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983). The words must do more than annoy, offend, or embarrass the plaintiff. *Id.* Rather, a statement must be reasonably construable as holding the plaintiff up to public hatred, contempt, or ridicule and carrying an element "of disgrace." *Id.* (quoting W. Prosser, Law of Torts § 111 (4th ed. 1971)). To determine if any of Rouse's statements are reasonably capable of a defamatory meaning, the court examines his words and gives them their "plain and natural" meaning, *Nichols*, 569 S.W.2d at 419 n.7, judged "in light of the surrounding circumstances," *Woodruff v. Ohman*, 166 Fed. Appx. 212, 216 (6th Cir. 2006) (citing *Revis v. McClean*, 315 S.W.3d 250, 253 (Tenn. Ct. App. 2000). Forsman bears the burden to show that at least one of Rouse's statements is reasonably capable of a defamatory meaning. *See id.* at 420.

The tort of defamation protects not only an individual's general standing in the greater community, but also his business reputation in his professional community. *See Smith v. Fielden*, 326 S.W.2d 476, 480 (Tenn. 1959); *Dolan v. Poston*, No. M2003-02573-COA-R3-CV, 2005 Tenn. App. LEXIS 631, at *14 (Tenn. Ct. App. Sept. 29, 2005) ("While the law of defamation applies generally to protect a person's reputation within the community, the law is especially concerned about defamatory statements that tend to prejudice a party in his business, trade, office or profession."). For this reason, Tennessee courts have recognized that a false statement is actionable where it refers to an individual's profession, either expressly or impliedly, and prejudices him in his profession. *Smith*, 326 S.W.2d at 480. Therefore, in some

7

situations, a statement about a professional in his trade "will bear an action that will not be actionable in the case of another person." W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 112 (5th ed. 1984) (quoted in *Dolan*, 2005 Tenn. App. LEXIS 631, at *14).

If a statement refers to an individual's business or trade and subjects him to disgrace within his professional community, the statement is reasonably capable of a defamatory meaning. *See Woodruff*, 166 Fed. Appx. at 216; *McWhorter v. Barre*, 132 S.W.3d 354, 364-65 (Tenn. Ct. App. 2003). In *Woodruff*, the Sixth Circuit Court of Appeals applied Tennessee law and held that a supervisor's letters about an employee were reasonably capable of a defamatory meaning. 166 Fed. Appx. at 216. The letters suggested that the employee, a research scientist, had not accumulated sufficient data for a single publishable paper in over two years of work, implying that she was not a competent scientist. *Id.* The Sixth Circuit held that such a statement was reasonably capable of a defamatory meaning because "an individual with Woodruff's level of education and achievement would likely be viewed with contempt if she was not able to perform the basic duties of her job, and this is thus clearly related to her professional reputation." *Id.* In *McWhorter*, the Tennessee Court of Appeals similarly held that a co-pilot's letter about his former colleague was reasonably capable of a defamatory meaning because "[i]t constituted a serious threat to [his] reputation as a pilot." 132 S.W.3d at 365. The co-pilot's letter accused his former colleague of federal law violations and unprofessional behavior, including sleeping in the cockpit, taking large doses of medication while on duty, and exhibiting behavioral changes. *Id.* at 356, 365. In affirming the trial court's decision, the *McWhorter* court concluded that the letter was reasonably capable of a defamatory meaning because, if its charges were false, the pilot's professional reputation had been "tarnished needlessly." *Id.* at

8

365 ("The [l]etter carried an element of disgrace because [p]laintiff's reputation as a pilot will forever have a 'black mark' as a result of the [l]etter.").

Although the precise words Rouse used to describe his interactions with Forsman remain unclear, for the purposes of evaluating the defendants' summary judgment motion, all inferences will be drawn in favor of the nonmoving party, Forsman. Applying this standard, Rouse made two possibly defamatory statements about Forsman to Cassidy and Ridenour. First, in his deposition, Cassidy testified that Rouse told him that Forsman had used the "f-word" in the September 2006 conversation. (Docket No. 32 at 11-12.) Second, Ridenour testified that Rouse stated that he had sanitized Forsman's language, leading Ridenour to believe that Forsman had used the "f-word" in the September 2006 conversation.[5] (Docket No. 33 at 13-14.)

The determinative question is whether a false claim that Forsman directed profanity toward Rouse is reasonably capable of a defamatory meaning. First, Rouse argues that, even if he falsely stated that Forsman used the "f-word" during their 2006 conversation, such an allegation is not defamatory because it cannot be reasonably construed as holding Forsman up to "public hatred, contempt or ridicule." (Docket No. 29 at 10.) Specifically, Rouse argues that, because the "f-word" is commonly used in American popular culture, an accusation that an individual used the "f-word" cannot be defamatory as a matter of law. (*Id.*) Second, Rouse contends that RBC terminated Forsman's employment regardless of whether Forsman used the "f-word" during the September 2006 conversation, and thus that none of Rouse's statements

---

[5]Forsman vehemently denies that he used profanity during his September 2006 conversation with Rouse. (Docket No. 35 at 14.) As Rouse points out, the parties largely agree on the content of the September 2006 conversation, with the exception of whether Forsman used the "f-word." (Docket No. 29 at 9-10 (noting that "the only difference between the versions of the conversation in question as recounted by plaintiff and defendant[s] is whether or not [the 'f-word'] was used during the course of the conversation.")

9

seriously threatened Forsman's professional reputation. (*Id.* at 10.) To support this argument, Rouse points to Ridenour's testimony that Forsman's alleged use of profanity was "just part of the aggressive, unprofessional behavior that he demonstrated toward Mr. Rouse." (Docket No. 33 at 27-28, 37-38.). In addition, Rouse points to the fact that Coffman's memorandum lists three specific examples of Forsman's unprofessional conduct that provided grounds for termination, none of which mentions Forsman's alleged use of the "f-word." (Docket No. 33 at Ex. 2.)

While a false accusation that an individual used profanity may merely embarrass or annoy a member of the general community, such a charge against an individual in the context of his business or trade may be defamatory if it subjects him to ridicule or disgrace within his professional community. At least one court has recognized the impact that a false accusation of profanity can have on one's professional reputation. *See Mahoney v. Adirondack Publ'g Co.*, 517 N.E.2d 1365, 1368 (N.Y. 1987). In *Mahoney*, the New York Court of Appeals held that a newspaper article that portrayed a high school football coach as directing profanity at his team's quarterback was reasonably capable of a defamatory meaning. *Id.* Although the *Mahoney* court acknowledged that such language may not be unusual for a football coach, it also noted that the thrust of the article condemned the behavior and called into question the coach's fitness for his profession. *Id.*

Assuming that Rouse falsely accused Forsman of using the "f-word," such a statement is reasonably capable of a defamatory meaning because it relates to Forsman's profession and poses a serious threat to his business reputation. As a securities broker, Forsman's professional reputation depends on his ability to develop and maintain relationships with clients in order to generate sales. Therefore, a false accusation that he directed a profanity-laced outburst at a client is not a mere annoyance or embarrassment. Rather, like an accusation that a scientist cannot

10

produce research or that a pilot takes pain killers and sleeps on the job, such an accusation calls into question whether Forsman has the ability and temperament to perform one of the basic duties of his job—interacting with current and potential customers in a professional manner. Like the newspaper article in *Mahoney*, the thrust of Rouse's statements condemned Forsman's behavior and called into question his fitness for his position. Thus, while Rouse correctly notes factual differences between the instant case and *Mahoney*, Rouse cannot distinguish *Mahoney*'s logic. In Forsman's profession, a false allegation that he used profanity is reasonably capable of a defamatory meaning because it poses a serious threat to his business reputation.

A reasonable jury could also conclude that Rouse's allegation that Forsman used profanity contributed to his termination at RBC. While Rouse relies on evidence suggesting that Forsman's alleged use of profanity played no role in his dismissal, he overlooks portions of Ridenour's testimony that support the opposite conclusion. First, Ridenour testified that, when he reached the decision to terminate Forsman's employment at RBC, Ridenour was under the impression that Forsman had used the "f-word" and that Forsman's language played at least some role in his decision. (Docket No. 33 at 26.) Second, after hearing Rouse's version of Forsman's comments, Ridenour found the situation so egregious that it warranted Forsman's termination without further investigation into Forsman's version of the incident or his personnel records. (Docket No. 33 at 32-33.) Third, Ridendour testified that this situation was the first in his career in which he felt that an employee's interaction with a customer justified termination without additional research. (*Id.*) Finally, while Coffman's memorandum omits Forsman's alleged use of profanity from the examples of unprofessional conduct that it lists to justify Forsman's termination, the memorandum also states that Forsman, in fact, used profanity in his conversation with Rouse. (Docket No. 33 Ex. 2.) Therefore, interpreted in its entirety, the

11

memorandum suggests that, at the time of their decision, Ridenour and Coffman believed that Forsman had used the "f-word" with Rouse and that this belief had some impact on their decision.

A reasonable jury could conclude that Ridenour's belief that Forsman had used the "f-word" colored his impression of the entire 2006 conversation, contributing to his decision to terminate Forsman without additional investigation. If so, Rouse's allegations may have resulted in serious damage to Forsman's professional reputation. Although there may be some merit to Rouse's argument that his allegation had no impact on RBC's decision to terminate Forsman's employment, the question is not a legal one that the court can resolve. Rather, a genuine issue of fact exists as to whether Rouse's allegation that Forsman used the "f-word" impacted RBC's decision to terminate his employment.

For the forgoing reasons, Rouse's statements are reasonably susceptible to a defamatory meaning. Therefore, Rouse's Motion for Summary Judgment with regard to Forsman's defamation claim will be denied.

## III. Intentional Interference with Employment[6]

Tennessee recognizes intentional interference with employment as a common-law tort. *Forrester v. Stockstill*, 869 S.W.2d 328, 330-31 (Tenn. 1994). In such an action, the fundamental allegation is that a third party "intentionally and without justification procured the discharge of

---

[6] Forsman's complaint asserts a claim for "tortious interference with employment relations." (Docket No. 1.) However, Forsman relies on *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002), which defined the tort of "intentional interference with business relationships," and *Forrester v. Stockstill*, 869 S.W.2d 328, 330-31 (Tenn. 1994), which relates to the tort of "intentional interference with employment." As will be discussed *infra*, however, these minor variations of terminology do not affect the following analysis.

12

the employee in question." *Id.* (quoting *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977)).

Additionally, in adopting the tort of intentional interference with business relationships, the Tennessee Supreme Court explained that it applies to "interference with a continuing business or other customary relationship not amounting to a formal contract." *See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 n.4 (Tenn. 2002) (adopting Restatement (Second) of Torts § 766B cmt. c (1979)). By definition, at-will employment is a non-contractual, continuing business relationship. *See Forrester*, 869 S.W.2d at 330 (holding that employee's at-will status prevented a claim on breach of contract theory because he had no contractual right to continued employment). Furthermore, while it was decided prior to *Trau-Med*, *Forrester* equates the torts of intentional interference with employment and intentional interference with business relationships. *See Forrester*, 869 S.W.2d at 329-30 (discussing the two torts interchangeably). For these reasons, the elements that a plaintiff must prove to bring a claim for international interference with business relationships apply equally to a claim for international interference with employment.

Thus, in order to pursue his claim, Forsman must prove: (1) his existing or prospective business relationship with RBC; (2) Rouse's knowledge of his relationship with RBC and not just "mere awareness" of Forsman's general business activities; (3) Rouse's intent to cause the breach of Forsman's business relationship with RBC; (4) Rouse's "improper motive" or use of "improper means"; and (5) injury resulting from Rouse's interference. *See Trau-Med*, 71 S.W.3d at 701. Rouse argues that summary judgment is appropriate because Forsman has not established

13

the second, third, fourth, and fifth elements of his claim.[7] Specifically, Rouse argues that he had only "mere awareness" of Forsman's general business activities, that he did not intend for RBC to discipline or terminate Forsman's employment, that his motive was not to injure Forsman, and that his interference was not the proximate cause of Forsman's termination. For the purposes of evaluating the Rouse's summary judgment motion, all inferences will be drawn in favor of the nonmoving party, Forsman.

On the second element, Rouse alleges that Forsman has not established Rouse's knowledge of Forsman's business relationship with RBC. Because Rouse had no knowledge of the terms of Forsman's employment agreement, Rouse contends that he had nothing more than the "mere awareness" of Forsman's relationship with RBC. (Docket No. 34 ¶ 18.) However, *Trau-Med* neither holds nor implies that the plaintiff must establish the defendant's knowledge of the specific terms of the plaintiff's business relationship. *See* 71 S.W.3d at 701. Rather, the plaintiff must simply show the "defendant's knowledge of [the plaintiff's relationship with the third party] and not a mere awareness of the plaintiff's business dealings with others in general." *Id.* In his deposition, Rouse acknowledged that he had done business with RBC exclusively through Forsman for a number of years. (Docket No. 37 at 10-16.) Therefore, a reasonable jury could conclude that Rouse knew that Forsman was an RBC employee.

---

[7] In his statement of the law, Rouse incorrectly posits that Forsman must prove the elements that comprise the tort of procurement of breach of contract. (Docket No. 29 at 10-11.) However, *Forrester* itself concluded that a claim for interference with employment was distinct from a claim for procurement of breach of contract. 869 S.W.2d at 330. Although Rouse misstates the governing law, the elements that comprise the tort of procurement of breach of contract are sufficiently similar to those that comprise the tort of intentional interference with employment such that Rouse's motion can be interpreted as challenging Forsman's ability to establish four of the required elements of a claim of intentional interference with employment. (Docket No. 29; Docket No. 38.)

14

On the third element, Rouse argues that Forsman has not established Rouse's intent to cause his termination. In his affidavit, Rouse stated that he never intended for RBC to discipline or terminate Forsman and that he simply believed that RBC would have wanted to know about Forsman's conduct because, if he had been an RBC supervisor, he would have wanted to know of such an incident. (Docket No. 28 at ¶ 15.) Rouse also stated that he neither requested nor suggested that RBC take any disciplinary action against Forsman. (Docket No. 28 at ¶ 13.) In their depositions, both Cassidy and Ridenour confirmed that Rouse never asked for RBC to discipline or terminate Forsman. (Docket No. 32 at 9; Docket No. 33, at 15-16.)

Although Rouse presents some evidence in his favor on the intent element, Forsman has presented sufficient evidence such that a reasonable jury could find, to the contrary, that Rouse intended to interfere with Forsman's employment at RBC. First, in his deposition, Cassidy testified that Forsman "was questioning why a firm of our reputation would have an individual like [Forsman] working for us." (Docket No. 32 at 15-16.) Second, Forsman argues that, because no RBC broker was on Broadway Bank's approved list at the time of the incident, Rouse had no prospect of doing business with RBC in the near future. (Docket No. 37 at 38.) Therefore, because Rouse had no business-related motive to inform RBC of Forsman's conduct, Rouse's motive could be presumed to be personal—to harm Forsman. Finally, Forsman draws the court's attention to the difference in Rouse's transactions with RBC before and after Forsman's termination, noting that, while Rouse conducted only a single $1 million bond purchase with Forsman, Rouse completed between ten and twenty bond purchases, totaling at least $5 million, with Rouse's replacement at RBC, and suggesting that Rouse rewarded RBC for replacing Forsman. (Docket No. 37 at 13, 54-55.) Drawing all inferences in favor of Forsman, a reasonable

15

jury could conclude that Rouse wanted RBC to discipline or terminate Rouse and that his actions were intended to bring about this result.

On the fourth element, Rouse contends Forsman has not established that Rouse acted on an improper motive.[8] In order to proceed with his claim, however, Forsman must prove either that Rouse had an improper motive or that Rouse utilized improper means to interfere with his employment; Forsman need not prove both. *Watson's Carpet & Floor Covering, Inc. v. McCormick*, 247 S.W.3d 169, 173 (Tenn. Ct. App. 2007) (explaining *Trau-Med*, 71 S.W.3d at 701) ("It is important to note that either 'improper motive' or 'improper means' will suffice."). To establish improper motive, the plaintiff must demonstrate that "the defendant's predominant purpose was to injure the plaintiff." *Trau-Med*, 71 S.W.3d at 701 n.5. Alternatively, to establish improper means, the plaintiff must prove that the defendant's means were illegal, independently tortious, in violation of a trade or professional standard or "otherwise involve[d] unethical conduct, such as sharp dealing, overreaching, or unfair competition." *Id.* Illegal or independently tortious activities include common-law violations, such as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Id.* Because Forsman has already established a genuine issue of fact as to whether Rouse made defamatory statements about him to Cassidy and Ridenour, *see* discussion *supra* Part II, he has established a genuine issue of fact as to whether Rouse used improper means.

---

[8] Rouse only explicitly challenges Forsman's ability to prove intent, the third element of intentional interference with employment. However, because the "improper motive" prong of the fourth element is similar to intent, his motion will be interpreted as challenging Forsman's ability to prove this element as well.

16

Finally, Rouse argues that Forsman has not established that Rouse's interference resulted in damage to Forsman. Relying on Ridenour's deposition testimony, Rouse argues that Forsman's own conduct, rather than Rouse's allegedly false statements about Forsman's conduct, caused RBC to terminate his employment. (Docket No. 33 at 27-28; 37-38.) However, whether Rouse's allegedly false statements played a role in Forsman's termination remains an issue of disputed fact. *See* discussion *supra* Part II. As noted, Ridenour stated in his deposition that, at the time of his decision to terminate Forsman's employment, he acted under the belief that Forsman had used profanity and that it play some role in his decision. (Docket No. 33 at 26.) Therefore, a genuine issue of material fact exists as to whether Rouse's interference played a role in Forsman's termination.

For the foregoing reasons, Forsman has established a genuine issue of material fact as to each of the elements. Therefore, Rouse's Motion for Summary Judgment with regard to Forsman's claim of intentional interference with employment will be denied.

## CONCLUSION

For the reasons discussed herein, the defendants' Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

17